JUDGE CAPRONI

**14 CV 1793**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NATHANIEL YATES,

    Plaintiff,

-against-

CITY OF NEW YORK, ANTONIO GONZALEZ, Individually, FRANCISCO ROA, Individually, ROBERT DECKERT, Individually, WILLIAM DAVOLI, Individually, ANDREW JACKSON, Individually, and DERICK BENTLEY, Individually.

    Defendants.

**COMPLAINT**

Docket No.

**Jury Trial Demanded**

---

  Plaintiff NATHANIEL YATES, by his attorney, The Trainor Law Firm, P.C., complaining of the defendants, respectfully alleges as follows:

### PRELIMINARY STATEMENT

  1. Plaintiff brings this action for compensatory damages, punitive damages, and attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of his civil rights, which are secured by these statutes and the United States Constitution.

### JURISDICTION

  2. Plaintiff brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution.

  3. This Court has jurisdiction to hear all claims in this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

### VENUE

  4. Venue is properly laid in the Southern District of New York pursuant to 28 U.S.C.

§ 1391(b) because this is the District in which the claim arose.

## JURY DEMAND

5. Plaintiff respectfully demands a trial by jury on all issues in this matter pursuant to Federal Rule of Civil Procedure 38(b).

## PARTIES

6. Plaintiff NATHANIEL YATES is a thirty-three year old African-American man and United States citizen who resides in New York, New York.

7. Defendant CITY OF NEW YORK was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

8. Defendant CITY OF NEW YORK maintains the New York City Police Department ("NYPD"), a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the aforementioned municipal corporation, the CITY OF NEW YORK.

9. At all times hereinafter mentioned, the individually named defendants, ANTONIO GONZALEZ, FRANCISCO ROA, ROBERT DECKERT, WILLIAM DAVOLI, and ANDREW JACKSON, were duly sworn police officers of the NYPD and were acting under the supervision of the NYPD and according to their official duties.

10. At all times hereinafter mentioned, the individually named defendant, DERICK BENTLEY, was a duly sworn police officer and supervisor of the NYPD and acting according to his official duties with the NYPD. As an NYPD Sergeant, DERICK BENTLEY was a ranking uniformed officer with supervisory responsibilities, and an NYPD policy maker with respect to the matters complained of herein.

11. At all times hereinafter mentioned, the defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages, and/or practices of the State of New York and/or the CITY OF NEW YORK.

12. Each and all of the acts of the defendants alleged herein were done by these defendants while acting within the scope of their employment with Defendant CITY OF NEW YORK.

## FACTS

13. On March 12, 2013, at approximately 9:45 p.m., a moving automobile struck Plaintiff Nathanial Yates while he was walking across the street at First Avenue and 106th Street, in New York, New York. This automobile knocked Mr. Yates to the ground, and he was in severe pain. As a result, Mr. Yates sought medical attention and was treated and released at Mount Sinai Medical Center's Emergency Room. Upon being released from Mount Sinai Medical Center, Mr. Yates went home, which was located at 80 Amsterdam Avenue, in New York, New York, a New York City Housing Authority building, and arrived there at approximately 5:30 a.m., on March 13, 2013.

14. At approximately 6:30 a.m., on March 13, 2013, Mr. Yates was lying in bed when his wife, Kashanna Macklin-Yates, who was working as a dental assistant at the time and was getting ready for work, informed him that she heard a knock on the front door. Surprised by this early-morning visit, Mr. Yates got up, went to the door, and asked who was at the door prior to unlocking and opening it. The person at the door claimed to be from "housing." Mr. Yates then unlocked and opened the door.

15. As soon as Mr. Yates opened the front door, the individual at the door began

taking photographs of Mr. Yates and his apartment. Taken aback and having only recently been released from the Emergency Room after being struck by a moving car, Mr. Yates demanded that this individual identify himself. This individual, whom Mr. Yates later learned to be "Ronny Stattyn," claimed he was the city marshal.[1]

16.     Mr. Yates then asked Stattyn to show him identification to prove that he was a city marshal. Stattyn gave Mr. Yates an identification card. Mr. Yates informed Stattyn to wait at the door because he was going to show his wife the identification card.

17.     Upon Mr. Yates informing Stattyn that he was going to show his wife Stattyn's identification, Stattyn pushed through the door of Mr. Yates's apartment. Mr. Yates was able to grab a bat after Stattyn tried to force his way into Mr. Yates's home; and, as he held the bat in his hand, Mr. Yates informed Stattyn to back up. Not once did Mr. Yates touch Stattyn with this bat or threaten to do so. Stattyn then left without requesting his identification be returned.

18.     Approximately fifteen minutes later, Mr. Yates left his apartment and was going to the bank to get money from the ATM. While Mr. Yates was walking toward the bank, his wife called him and said there was a man repeatedly banging on the door and that she was afraid, especially because she was alone caring for their then-eight-month old son. Mr. Yates informed his wife that he was calling the police and was coming home immediately. Mr. Yates then called 911 and explained that someone was banging on his apartment front door and frightening his

---

[1]     Upon information and belief, the New York City Department of Consumer Affairs sued Ronny Stattyn, under the heading "Assurance of Discontinuance" and "Process Server Individual," for, among other violations, violating provisions of the Administrative Code of the City of New York related to "License Enforcement Law," "Process Servers Law," and "Process Servers Rules" in connection with his Process Server license. Dep't of Consumer Affairs v. Ronny Stattyn, Violation No. LL #5133483, Lic. # 0861178, dated April 14, 2009, http://www.nyc.gov/html/dca/downloads/pdf/sa_Ronny_Stattyn_0861178 _2009.pdf (last visited on Mar. 13, 2014).

wife and baby.

19.  When Mr. Yates returned to his apartment at 80 Amsterdam Avenue, he observed two NYPD vehicles in front of his building.  Naturally, Mr. Yates believed that the police were there because he had called them to his home and his wife and baby would now be safe.  As Mr. Yates entered his building and walked toward his apartment, he observed the defendants in front of his apartment door.  Mr. Yates explained to the defendants that he called them because a man was banging on his door while he was not home and frightening his wife, who was alone caring for their child.

20.  As Mr. Yates explained this to the defendants, Stattyn informed the defendants that Mr. Yates took his identification.  One of the defendants asked Mr. Yates where the identification card was, and Mr. Yates explained that it was on the mantle right by the apartment's front door.

21.  Mr. Yates proceeded into his apartment to retrieve Stattyn's identification.  Almost immediately upon Mr. Yates entering his apartment, upon information and belief, Defendant Antonio Gonzalez and Defendant Francisco Roa, without any lawful justification whatsoever, grabbed Mr. Yates's arm and slammed him head first into the door about two or three times.

22.  Defendants Gonzalez and Roa then grabbed Mr. Yates's arm and yanked it behind him. Mr. Yates pleaded with the defendants that they were hurting his arm, that he had just been hit by a car the night before and was very recently released from the hospital, and to please stop pulling his arm.  The defendants then threw Mr. Yates into the hallway of the apartment building and, without any lawful justification whatsoever, began pummeling him with abandon.

23.  Defendants Gonzalez, Roa, and, upon information and belief, the other individual

defendants, began punching Mr. Yates with closed fists and yanked him down to the floor and smashed his head onto the floor. Mr. Yates was in severe pain and pleading with the defendants to stop beating him up because he was hit by a car the night before and was in no way resisting them. While the defendants engaged in what can only be described as a "gang assault" upon Mr. Yates, his wife, hearing the commotion and her husband's pleas for the defendants to stop beating him up and that he had just been hit by a car the night before, rushed to the door and observed her husband on the floor and the defendants beating him mercilessly.

24. Ms. Macklin-Yates observed the defendants punching and kicking her husband and pleaded with them to stop and explained that Mr. Yates had left the hospital only hours ago after being hit by a car. One of the defendants, who was actively attempting to block Ms. Macklin-Yates's view of the defendants' gang assault upon her husband, demanded that Ms. Macklin-Yates show him documentation to prove that her husband was released from the hospital.

25. Upon the defendant's demand for the hospital documentation, Ms. Macklin-Yates ran into her apartment to retrieve any paperwork she could immediately find to show that her husband was in the hospital and she found the admission bracelet that the hospital placed on Mr. Yates's wrist.

26. All the while the defendants continued to punch and kick Mr. Yates who was on the ground defenseless, in severe pain, in no way resisting or obstructing them, and pleading with them to stop beating him up. Ms. Macklin-Yates then showed the defendant her husband's hospital bracelet and observed that the defendants had Mr. Yates completely pinned to the floor and defenseless, yet the defendants continued to pummel him violently. She continued to plead with the defendants to stop beating up her husband.

27. Then, as the rest of the defendants eventually began letting up on beating Mr. Yates, Defendant Gonzalez continued to stomp on Mr. Yates, kicking Mr. Yates in the face viciously, and finally stomping on Mr. Yates's left hand with his foot. Medical records would later confirm that the defendants broke Mr. Yates's left middle finger.

28. Finally, the defendants placed handcuffs on Mr. Yates's wrist. Upon handcuffing him, one of the defendants sprayed, upon information and belief, "pepper spray" directly into Mr. Yates's face. This chemical agent caused Mr. Yates's eyes to involuntarily close while enduring a profound burning sensation, and caused Mr. Yates to begin choking, gasping for air, and feeling effects akin to asphyxiation, all the while he was on the floor, rear-handcuffed, and completely beaten down.

29. At this point, the defendants lifted Mr. Yates off of the floor and took him to an NYPD vehicle and transported him to the NYPD's 20th Precinct, where he remained imprisoned and in pain, suffering the effects of being violently assaulted and being pepper sprayed directly in the face at close range.

30. The defendants placed Mr. Yates in jail cell at the 20th Precinct, and Mr. Yates still could not see or breathe normally. He requested medical attention; and the police informed him that, if he went to the hospital, he would remain in custody even longer.

31. The physical pain from the defendants' gang assault upon Mr. Yates, however, was too much for him to simply wait it out. Mr. Yates informed the defendants that he needed to go to the hospital because his entire body – especially his left hand, wrist, elbow, and shoulder – was in substantial pain. The defendants then handcuffed Mr. Yates again and transported him to Roosevelt Hospital's Emergency Room for treatment.

32. While in the hospital, Mr. Yates overheard one of the defendants tell a nurse in

the Emergency Room, in sum and substance, that Mr. Yates's injuries were from a car accident that he had been in the night before. Hearing the defendant attempt to cover up his and his co-defendants' unjustified assault upon him, Mr. Yates informed the nurse, in sum and substance, that he was seeking treatment because the defendants assaulted him and he was hurt and in pain.

33. As a result of the defendants' violent and unjustified assault upon him, Mr. Yates sustained the following injuries, including without limitation: a broken middle finger of his left hand (Mr. Yates is left-hand dominant, or colloquially known as a "lefty"), and the pain was so severe that the treating physician in the Emergency Room of Roosevelt Hospital prescribed Mr. Yates Percocet and fitted his finger for a splint; what medical personnel believed was a possibly fractured left elbow for which they fitted Mr. Yates with a sling; left wrist ligament trauma and injury; multiple joint pain; ankle pain; chest pain; swelling of his hands and wrists; muscle pain; persistent discomfort; motion loss; physical and psychological torment and extreme distress; and further physical and psychological injuries yet to be revealed.

34. Additionally, the physical injuries that Mr. Yates received as a result of the defendants assaulting him compelled him to attend physical therapy and follow-up treatment, endure substantial restrictions on his daily activities, receive steroid injections, and have to wear daily a custom forearm-based thumb spica splint for well over a month.

35. At no time did Mr. Yates refuse to give the defendants Stattyn's identification card.

36. At no time did Mr. Yates resist arrest or obstruct governmental administration.

37. Nevertheless, upon Mr. Yates's release from Roosevelt Hospital, the defendants again handcuffed him and transported him back to the 20th Precinct and imprisoned him there. Eventually, the defendants transported Mr. Yates to the Manhattan Detention Complex, where he

remained imprisoned until he was brought before the New York County Criminal Court for arraignment on the baseless charges filed under docket number 2013NY020937. These charges were filed based upon the false allegations of Defendant Robert Deckert.

38. Defendant Deckert informed the New York County District Attorney's Office that Ronny Stattyn informed him that Mr. Yates took his identification card and went back into his apartment, and that when Stattyn asked for his identification back, Mr. Yates menaced him with a bat.

39. Further, Defendant Deckert knowingly and falsely informed the District Attorney's Office that Mr. Yates refused to give him Stattyn's identification card and resisted arrest and obstructed governmental administration.

40. Upon Mr. Yates being arraigned in the New York County Criminal Court upon these false charges, the presiding Criminal Court judge released Mr. Yates from custody on his own recognizance in the early morning hours of March 14, 2013.

41. Mr. Yates was compelled to return to the New York County Criminal Court on approximately four occasions until October 16, 2013, when, upon the application of the District Attorney's Office, the case was adjourned in contemplation of dismissal pursuant to New York Criminal Procedure Law § 170.55.

42. All of the events leading up to and culminating in Mr. Yates being assaulted violently by the defendants without any justification whatsoever and the resulting false allegations that the defendants advanced against Mr. Yates occurred while other NYPD officers, including, but not limited to, the individually named defendants, either participated in or failed to intervene in this illegal conduct.

43. All of the above occurred as a direct result of the unconstitutional policies,

customs, or practices of Defendant CITY OF NEW YORK, including, but not limited to, the inadequate screening, hiring, retaining, training, promoting, compensating, disciplining, and supervising of its employees.

44. The underlying application of excessive force is not an isolated incident. Defendant CITY OF NEW YORK is aware, from lawsuits, notices of claims, press accounts, and complaints filed with the NYPD's Internal Affairs Bureau, and the CITY OF NEW YORK's Civilian Complaint Review Board, that many NYPD officers, including the defendants, abuse their authority and are insufficiently trained regarding the application of force in light of the facts and circumstances confronting them in the course of citizen-police encounters. Further, these officers routinely apply excessive force in the course of an arrest while their fellow police officers either actively participate in or fail to intervene to prevent this unconstitutional conduct; and, upon applying such force, these officers engage in falsification, including, but not limited to, charging victimized citizens with resisting arrest and obstructing governmental administration. See, e.g., Graham v. City of New York, 928 F. Supp. 2d 610 (E.D.N.Y. Mar. 6, 2013) (lawsuit against the City of New York and individual NYPD officers for the officers' use of excessive force and violation of civil rights); Rodriquez v. City of New York, 10 Civ. 9570 (PKC) (KNF), 2012 WL 1658303, at *1 (S.D.N.Y. May 10, 2012) (same); Tucker v. City of New York, 704 F. Supp. 2d 347 (S.D.N.Y. 2010) (same); Williams v. City of New York, 06-CV-6601 (NGG), 2009 WL 3254465, at *1 (E.D.N.Y. Oct. 6, 2009) (same); Stroe v. City of New York, 02 CV 1036 (RRM) (LB), 2008 WL 4513823, at *1 (E.D.N.Y. Sept. 26, 2008) (same). See also Robert Gearty, Bronx man suing NYPD for excessive force for a rough arrest captured on cell phone video, N.Y. DAILY NEWS, Sep. 10, 2012, http://www.nydailynews.com/new-york/bronx/bronx-man-suing-nypd-excessive-force-rough-arrest-captured-cell-phone-video-

article-1.1156308 (Only months before the defendants assaulted Mr. Yates, a Bronx man sued the City of New York and the individual NYPD officers for excessive force upon allegations remarkably similar to those alleged in this case: "The video lasts about one minute and appears to show then 19-year-old Luis Solivan being pummeled in the face several times by one officer as the other cop pinned him down. . . . [T]he two officers chased Solivan into his home for no reason, pepper-sprayed him and beat him with their hands and a walkie-talkie. Solivan's mother and two younger brothers were in the University Avenue apartment at the time. After Solivan was hand-cuffed, he was kicked and his head was thrust into a wall so hard the impact left a hole . . . ."); Daniel Beekman, <u>Man wins $2.5 million in lawsuit against NYPD cops over using excessive force</u>, N.Y. DAILY NEWS, Dec. 19, 2013, http://www.nydailynews.com/new-york/man-wins-2-5m-suit-nypd-article-1.1552534 (The plaintiff sued the City of New York and the individual NYPD officers and the jury awarded him $2,500.000.00 in damages at trial because an NYPD officer "threw him down and kicked him in the knee," causing a ripped ligament and serious knee damage, simply because the plaintiff was watching a fight outside of a bar.); Kevin Deutsch, <u>Lawyer for drug suspect who was beaten by cops demands special prosecutor</u>, N.Y. DAILY NEWS, Feb. 6, 2012, http://www.nydailynews.com/news/crime/lawyer-drug-suspect-beaten-cops-demands-special-prosecutor-article-1.1018037#ixzz2vs7snZ6M (describing the case of Jateik Reed, who was brutally assaulted by NYPD officers in the Bronx and the incident was captured on video). See also NEW YORK CITY CIVILIAN COMPLAINT REVIEW BOARD, "Bi-Annual Report, January - June 2013 Report," http://www.nyc.gov/html/ccrb/downloads/pdf CCRBsemi2013_jan_June.pdf ("In the first half of 2013, excessive use of force was alleged in 55% of complaints compared to 49% in 2012 . . . ."); NEW YORK CITY CIVILIAN COMPLAINT REVIEW BOARD, "2012 Annual Report," http://www.nyc.gov/html/ccrb/downloads/pdf/ccrb_